# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**LESLIE BELLO**                                                    **CIVIL ACTION**

**VERSUS**                                                          **NO. 20-88-JWD-SDJ**

**PATRICK COOPER AND
ERNEST GARRETT**

---

## <u>NOTICE</u>

Please take note that the attached Magistrate Judge's Report and Recommendation has been filed with the Clerk of the U.S. District Court for the Middle District of Louisiana.

Under 28 U.S.C. § 636(b)(1), you have **14 days** from receipt of this Notice to file written objections to the proposed findings of fact and conclusions of law in the Magistrate Judge's Report and Recommendation. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

Signed in Baton Rouge, Louisiana, on September 13, 2022.

_____

**SCOTT D. JOHNSON
UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**LESLIE BELLO**                                      **CIVIL ACTION**


**VERSUS**                                            **NO. 20-88-JWD-SDJ**


**PATRICK COOPER AND**
**ERNEST GARRETT**

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Before the Court is a Motion for Summary Judgment (R. Docs. 28) filed by Defendants, Dr. Patrick Cooper and Ernest E. Garrett, III, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Leslie Bello timely filed an Opposition (R. Doc. 34) in response to Defendants' Motion.[1] After reviewing Plaintiff's Opposition, Defendants filed a Reply Memorandum (R. Doc. 40) on November 29, 2021. Plaintiff then sought and was granted leave to file a Sur-Reply (R. Doc. 45). The Court now considers this matter to be fully briefed. For the reasons given below, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgement (R. Doc. 28) be **GRANTED** and that Plaintiff's cause of action be **DISMISSED**.

## I.    BACKGROUND

This litigation involves schools and employees within the Special School District. By way of background, the parties agree on the following facts regarding the Special School District

---

[1] Because both sides sought leave of Court to exceed the page limit applicable to supporting memoranda (R. Docs. 27, 34), Defendants' Memorandum in Support of their Motion for Summary Judgment (R. Doc. 28) is found at Record Document 31 and Plaintiff's Memorandum in Opposition (R. Doc. 34) is found at Record Document 36.

(SSD), as well as Dr. Patrick Cooper's time as its Interim Superintendent and Plaintiff's employment with LSVI:

> The [SSD] provides educational opportunities to students in Louisiana who have low-incidence disabilities and a variety of unique needs. Currently, SSD serves approximately 1,800 students across the state. The district operates three schools – Louisiana School for the Deaf in Baton Rouge (LSD), Louisiana School for the Visually Impaired in Baton Rouge (LSVI), and Louisiana Special Education Center in Alexandria (LSEC). . . .
>
> Dr. Patrick Cooper [] served as the Interim Superintendent of the Special School District from July 2018 until June 2019.
>
> Plaintiff Leslie Bello [] began working at LSVI in 2009. . . . In May 2017, Bello was promoted to the position of Acting Director of LSVI. As the Acting Director of LSVI, Bello was in charge of the day-to-day operations of LSVI and had numerous direct reports.

(Material Fact Nos. 1, 7, 12, 14 of Def.'s Statement of Material Facts, R. Doc. 28-8 at 1, 3, 4); (Pl.'s Resp., R. Doc. 36-1 at 1, 2, 3) (Plaintiff admits Def.'s Material Fact Nos. 1, 7, 12, 14). With that background information in hand, the Court turns to the relevant allegations.

In her Complaint, Plaintiff alleges that Defendant Cooper forced Plaintiff's resignation from her job as Director of the Louisiana School for the Visually Impaired (LSVI) on February 28, 2019, in retaliation for Plaintiff's exercising her constitutionally-protected rights. (R. Doc. 1). Specifically, Plaintiff alleges that Cooper, who was Interim Superintendent of the Special School District (SSD) at the time, "retaliated against [her] by causing the constructive termination of her employment with LSVI in response to Ms. Bello expressing her views about the Senate confirmation of Dr. Patrick Cooper in violation of the First and Fourteenth Amendments to the United States Constitution and La. Const. Art. I, § 7." (R. Doc. 1 at 7). Plaintiff additionally claims that Cooper "constructively terminated [her] in response to Ms. Bello exercising her rights under La. Const. Art. I, § 5 to be secure in her communications against unreasonable searches, seizures, and invasion of privacy and her similar rights under the Fourth and Fourteenth Amendments to the

United States Constitution." (R. Doc. 1 at 8). She also claims that Cooper violated state law by making defamatory statements about Plaintiff to the Louisiana State Board of Elementary and Secondary Education (BESE) in March of 2019, following her termination. (R. Doc. 1 at 7-8).

Plaintiff has sued Cooper in his individual capacity for damages under 42 U.S.C. § 1983 "for violation of her civil rights as provided in the First, Fourth, and Fourteenth Amendments to the United States Constitution." (R. Doc. 1 at 1) (she asserts the same conduct violated article I, sections 5 and 7 of the Louisiana Constitution, as well). She also brings a defamation claim against Cooper under state law.

In addition to Cooper, Plaintiff has sued Ernest Garrett in his official capacity as the current Superintendent of the Special School District under 42 U.S.C. § 1983 for injunctive relief. More specifically, Plaintiff requests reinstatement from Garrett if her constitutional claims against Cooper succeed. (R. Doc. 1 at 8).

## II.    LEGAL STANDARD

Summary judgment is appropriate if the moving party, "citing to particular parts of materials in the record," can show "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). However, when the non-movant bears the burden of proof at trial, the party seeking summary judgment must only show that an essential element of the non-movant's claim cannot be established. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."). The Court must construe all facts and inferences in the light most favorable to the non-movant and cannot weigh evidence or

evaluate credibility. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

## III.    DISCUSSION

Plaintiff alleges she was constructively discharged by Cooper in retaliation for exercising her right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution[2] and article I, section 7 of the Louisiana Constitution.[3] Plaintiff also alleges that her constructive discharge was retaliation for Plaintiff's assertion of her right to be free from unreasonable searches — i.e., for refusing to allow Cooper to search her personal cell phone — in violation of the Fourth and Fourteenth Amendments to the United States Constitution[4] and article I, section 5 of the Louisiana Constitution. The Court will first analyze Plaintiff's constitutional claims against Cooper before turning to her claim for injunctive relief against Garrett and, finally, her state law defamation claim against Cooper.

---

[2] "The First Amendment does not apply directly to the states, but rather has been incorporated through the Fourteenth Amendment Due Process Clause." *Doe v. Dallas Indep. Sch. Dist.*, 194 F. Supp. 3d 551, 561 n.11 (N.D. Tex. 2016); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996). And so, Plaintiff's "First Amendment claim is really a Fourteenth Amendment claim." *Doe v. Dallas Indep. Sch. Dist.*, 194 F. Supp. 3d at 561 n.11. But for convenience, the Court will simply refer to this as Plaintiff's First Amendment claim.

[3] The parties' arguments at summary judgment focus on Plaintiff's federal constitutional claims; however, the parties suggest that the Court should reach the same resolution of Plaintiff's "analogous state law claims under La. Const. Art. I, § 5 and § 7." (R. Doc. 36 at 33); (R. Doc. 31). Because the Court agrees the analysis is the same under both the federal and state constitutions, it will not separately analyze Plaintiff's identical claims for retaliation under the Louisiana Constitution. *See Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 231 (5th Cir. 2016) ("As summary judgment is proper as to Plaintiffs' First Amendment claims, summary judgment is also proper on Plaintiffs' Article I, § 7 state law claims."); *State v. Franzone*, 384 So.2d 409, 411 (La. 1980) (under Louisiana jurisprudence, a court's determination of a claim brought under the parallel sections of the federal constitution is applicable to the corresponding section of the state constitution).

[4] "The Fourth Amendment applies to the states through the Fourteenth Amendment." *Dickerson v. City of Denton*, 298 F. Supp. 2d 537, 541 (E.D. Tex. 2004); *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961). But again, the Court will simply refer to this as Plaintiff's Fourth Amendment claim.

.

A.     **First Amendment Retaliation**

The First Amendment prevents public employers from retaliating against employees who exercise their free speech rights as private citizens. *See Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). To bring a First Amendment retaliation claim against a government employer, an employee must establish that (1) she suffered an adverse employment action, (2) she spoke as a citizen on a matter of public concern, (3) she has a greater interest in the speech than the government has in the efficient provision of public services, and (4) a "causal connection" exists between the speech and the adverse employment action. *See Rushing v. Mississippi Dep't of Child Prot. Servs.*, 2022 WL 873835, at *2 (5th Cir. Mar. 24, 2022).

Here, Plaintiff claims that she engaged in protected speech on February 27, 2019, when she sent 3 emails from her personal email address to State Representative Jerry Lacombe, Senator Ricky Ward, and Pointe Coupee Parish President Major Thibaut. (R. Doc. 36 at 8-12) (arguing protected speech on February 27, 2019); (R. Doc. 34-18) (email to Representative Lacombe); (R. Doc. 34-19) (email to Senator Ward); R. Doc. 34-20) (email to Parish President Thibaut).

In each email, Plaintiff expressed concern over the potential confirmation of Patrick Cooper as Superintendent of the Special School District:

> I am hoping you can help me by making sure Pat Cooper is not confirmed as Superintendent of the Special School District when the legislature convenes in April. I am not sure if you know anything about Cooper or not. I can honestly say in my twenty-five years in education . . . I have never worked with anyone who is more ruthless than he is. He was appointed to this position [(Interim Superintendent of SSD)] by John White in August [of 2018]. In the past, he has harmed may [sic] school systems in multiple parishes . . . . He has a documented controversial career that continues to repeat itself wherever he goes. The sad part about this is his actions are hurting our kids. As director of Louisiana School for the Visually Impaired, I have watched the school deteriorate under his leadership. He has to be stopped. Senator Jay Luneau has requested confirmation of Cooper in the upcoming session. Please vote to have him removed! I also ask that you share this information to convince other legislatures [sic] to vote against him.

(R. Doc. 34-19) (Plaintiff's email to Senator Ricky Ward on February 27, 2019 at 9:39 a.m.).

The following morning — February 28, 2019 — Plaintiff was called to a meeting with Cooper, Julie Alcorn (HR Director) and Audrey Gaulthier (Chief Operating Officer of SSD). (Cooper Dep., R. Doc. 28-1 at 254-55). During that meeting, Plaintiff was accused of interfering in an official investigation into alleged sexual misconduct at the Louisiana Special Education Center (LSEC) in Alexandria. (Alcorn Dep., R. Doc. 34-4 at 12). Specifically, Plaintiff was asked whether she had sent a text message to Kristy Flynn, Director of LSEC, alerting Flynn that members of SSD were on their way to LSEC for an unannounced 'drop-in' to monitor the school as part of the investigation and to fire Flynn. (Cooper Dep., R. Doc. 28-1 at 246-47); (Gauthier Dep., R. Doc. 28-5 at 15); (Pl. Dep., R. Doc. 28-3 at 193-95, 352).

Plaintiff initially denied sending the text message to Flynn. (Pl. Dep., R. Doc. 28-3 at 202). She then admitted that she had been dishonest, revealing that she had indeed texted Flynn in early February of 2019. (Pl. Dep., R. Doc. 28-3 at 202). When Cooper asked to search Plaintiff's personal cell phone for additional communications between her and Flynn she initially agreed, but then withdrew her consent. (Pl. Dep., R. Doc. 28-3 at 196-97). At the end of the meeting, Plaintiff was given the choice to either resign or be terminated. Plaintiff resigned. (Pl. Dep., R. Doc. 28-3 at 202-03).

For purposes of this Motion for Summary Judgement, the Court will assume that Plaintiff can satisfy the first three elements of her claim — that she suffered an adverse employment action on February 28, 2019, when she was constructively discharged,[5] she engaged in protected speech

---

[5] In her Opposition, Plaintiff seems to be suggesting that a September 4, 2018 Letter of Reprimand and a five-day suspension without pay on September 10, 2018, were also adverse employment actions. (R. Doc. 36 at 16-18) ("further negating the validity of Bello's suspension . . . ."); (R. Doc. 36 at 19-23) (suggesting Defendant cannot provide a legitimate non-retaliatory reason for Bello's suspension, letter of reprimand or constructive discharge). This is problematic for several reasons. First, the Complaint is very clear that the only adverse employment action alleged by

on February 27, 2019, by emailing 3 legislators about her opposition to Cooper's confirmation as Superintendent, and that her interest in the speech outweighed the government's interest in the efficient provision of public services. Therefore, the only remaining element is causation. For the reasons given below, Plaintiff cannot establish that "the speech caused the adverse employment action" — an essential element of her claim. *Rushing*, 2022 WL 873835, at *2 (5th Cir. Mar. 24, 2022).

### i.    Causation

To establish a prima facie case of retaliation in violation of the First Amendment, Plaintiff must show that her protected speech "was a substantial factor or to put it in other words, that it was a 'motivating factor' in the . . . decision." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Luman v. Diaz*, 2022 WL 4001063, at *17 (S.D. Tex. Sept. 1, 2022) ("Plaintiffs asserting retaliation for exercising their First Amendment rights must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury.").

But at its most basic level, this element of Plaintiff's claim requires a showing that the decisionmaker had knowledge of the protected speech before the adverse employment action occurred.[6] *See Robinson v. Jackson State Univ.*, 714 F. App'x 354, 360 (5th Cir. 2017) ("The

---

Plaintiff is her constructive discharge on February 28, 2019. (R. Doc. 1). Beyond that, the protected speech on which Plaintiff's retaliation claim is based did not even occur until 2019. Therefore, a September 4, 2018 Letter of Reprimand and a September 10, 2018 suspension could not have been in retaliation for speech that would not even occur for several months. (R. Doc. 34-6) (Letter of Reprimand); (R. Doc. 34-9) (Suspension). While it seems obvious, the Court feels the need to clarify that to state a claim for retaliation, the adverse employment action must occur *after* the employee has engaged in protected activity. *See Balakrishnan v. Bd. of Supervisors of Louisiana State Univ. & Agr. & Mech. Coll.*, 452 F. App'x 495, 499 (5th Cir. 2011) (" . . . and these adverse actions occurred after she engaged in the protected activity"); *Douglas v. St. John Baptist Par. Libr. Bd. of Control*, 2022 WL 898746, at *15 (E.D. La. Mar. 28, 2022) ("But [an] adverse action that occurs before a 'protected activity' cannot form the basis of a retaliation claim.").

[6] Although not relevant to Plaintiff's case, "[t]here is an exception to this rule where the final policymaker's decision is merely a rubber stamp. If an employee can demonstrate that the subordinate's evaluation was tainted by an illegal

causation prong of any retaliation claim requires proof that the employer knew about the employee's protected activity." (citing *EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017) ("Demonstrating that a decisionmaker was aware of an employee's protected activity certainly requires more evidence than mere curious timing coupled with speculative theories.")).[7]

Here, Plaintiff argues in her Opposition that she engaged in protected speech on February 27, 2019, by emailing 3 legislators about her opposition to Cooper's confirmation as Superintendent. (R. Doc. 36 at 8-12).[8] The following morning, she was forced to resign—i.e., constructively discharged.

While temporal proximity between the protected conduct and the adverse employment action can give rise to an inference of causation, here, it does not. *See Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 230 (5th Cir. 2016) ("Though close timing . . . can be a

---

intent and that it had sufficient influence or leverage over the ultimate decisionmaker, the motives of the subordinate become relevant." *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 604 (5th Cir. 2001).

[7] In *Robinson v. Jackson State University*, the plaintiff alleged "two types of retaliation claims, Title VII and the First Amendment," both involving the same conduct. *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 358 (5th Cir. 2017). But while the Court noted that each claim involved "its own elements," both claims had a "shared component— that there must be a causal connection between [the protected activity or speech] and [the adverse employment action]." *Id.* at 359. The Fifth Circuit therefore conducted a single analysis to determine whether Plaintiff had established causation. At the outset, the Fifth Circuit noted that the "causation prong of any retaliation claim requires proof that the employer knew about the employee's protected activity." *Id.* at 360. It went on to "clarify[y]" its standard for demonstrating decisionmaker knowledge, citing past cases analyzing retaliation under both Title VII and the First Amendment. *Id.* (citing *Beattie v. Madison County School Dist.*, 254 F.3d 595, 604 (5th Cir. 2001) (First Amendment) and *Corley v. Jackson Police Dep't*, 639 F.2d 1296, 1300 n.6 (5th Cir. 1981) (Title VII)). "[I]n this circuit, [] we have consistently required proof of 'actual' decisionmaker knowledge. Whatever the law may be elsewhere, mere 'constructive notice' does not suffice in this circuit." *Id.*

The Court makes this point as Plaintiff relies on *Taylor v. Union Pac. R.R. Co., Inc.*, 2021 WL 952410, at *6 (M.D. La. Mar. 12, 2021) in arguing that "constructive knowledge" is all that is required. (R. Doc. 36 at 13 & n.66). However, *Taylor* considered a claim of discrimination under the Federal Railroad Safety Act, whose burden-shifting framework is unique to the FRSA and is "much easier" for a plaintiff to satisfy. *See Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 159 (3d Cir. 2013) ("It is worth emphasizing that the AIR–21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy . . . ."); *Davis v. Union Pac. R. Co.*, 2015 WL 5519115, at *3 (W.D. La. Sept. 17, 2015) ("Considering the plain meaning of the statute, FRSA burden-shifting is much more protective of plaintiff-employees than the" framework applicable to claims under Title VII). Therefore, *Taylor* is inapposite.

[8] In her Opposition, Plaintiff's argument that she engaged in protected speech focuses solely on the three emails she sent to Ward, Thibaut, and Lacombe on February 27, 2019. (R. Doc. 36 at 8-12).

sufficient basis for a court to find a causal connection . . . the court should view temporal proximity between the activity and the adverse action in the context of other evidence."). The fatal flaw in Plaintiff's claim is this—the record is devoid of evidence that Cooper knew about Plaintiff's February 27, 2019 emails.

The record evidence makes clear that Plaintiff emailed Ward, Thibaut, and Lacombe from her personal email account on the morning of February 27, 2019. (R. Docs. 34-18, 34-19, 34-20). Plaintiff has not presented any evidence that Cooper (or anyone within the Special School District) obtained access to her personal email account between the morning of February 27, 2019, and the morning of February 28, 2019.

Cooper testified that he had no knowledge of Plaintiff's February 27, 2019 emails to Ward, Thibaut, and Lacombe until she filed the instant lawsuit. (Cooper Dep., R. Doc. 28-1 at 82-84). HR Director, Julie Alcorn, who worked closely with Cooper and participated in the February 28, 2019 meeting, during which Plaintiff was forced to resign, also testified that she had no knowledge of the February 27, 2019 emails before being deposed for this litigation on May 6, 2021. (Alcorn Dep., R. Doc. 34-3 at 7-8). Ms. Alcorn likewise testified that she was unaware of any emails from any employees discussing opposition to Cooper's confirmation. (Alcorn Dep., R. Doc. 34-4 at 7). Beyond that, there is no evidence that Cooper (or anyone else at LSVI or within the Special School District) had any access to Plaintiff's personal email account during the 24-hour period between her protected speech and constructive discharge.

Indeed, Joe Amacker, the IT director, testified that he was never asked "by anyone" to access Plaintiff's "yahoo email account" and that accessing Plaintiff's personal email account through her work computer would not even be possible:

Q. What about her yahoo e-mail account?

A. We definitely do not touch personal accounts.

Q. Well, would it be possible to access an employee's personal e-mail account at LSVI?

A. No, sir. Unless they logged into their e-mail account, and even in that situation, I don't think we could access it because we would still have to have their computer log-in. So let's just say, per chance that the employee still employed with the SSD or LSVI, is logged into their computer and they step away. If they step away and they're already logged into their personal e-mail on the computer, then, of course, yes, you have access. But outside of that, there is no way for us to get access to someone's personal e-mail account.

(Amacker Dep., R. Doc. 34-15 at 8).[9] And while Mr. Amacker was the employee asked to retrieve communications between Plaintiff and Flynn from Plaintiff's cell phone on the morning of February 28, 2019, he testified that he was handed the cell phone, but Plaintiff withdrew her consent before he was able to conduct any search of the phone.[10] (Amacker Dep., R. Doc. 34-15 at 13). Amacker also made clear that he never accessed Plaintiff's emails on either her work or personal account. (Amacker Dep., R. Doc. 34-15 at 8).

And while Plaintiff testified that she believes Amacker actually did conduct a search of her personal cell phone between the time he received it and Plaintiff's withdrawing her consent, Plaintiff's belief is insufficient to create a factual dispute that might preclude summary judgment. *See Reyes v. Salazar*, 2020 WL 4018597, at *9 (W.D. Tex. July 15, 2020) ("Even at the summary judgment stage, this Court cannot find a genuine dispute of material fact based upon []

---

[9] Amacker also acknowledged that he received an email from Julie Alcorn on the morning of February 28, 2019, asking if there was "any way to pull emails between Leslie Bellow and Kristy Flynn." (Exh. 1 of Amacker Dep., R. Doc. 34-14); (Amacker Dep., R. Doc. 34-15 at 7). However, he testified this was the only request he'd received and that he actually did not have access to employees' work email accounts; and, without a password, he would have been required to ask someone at the Department of Administration to search Plaintiff's work email account for the requested communications between Plaintiff and Flynn. (Amacker Dep., R. Doc. 34-15 at 8).

[10] Plaintiff also testified that when Cooper asked if they could search her personal cell phone during the February 28, 2019 meeting, Plaintiff understood that Cooper was "looking for information between Kristy [Flynn] and [Plaintiff]." (Pl. Dep., R. Doc. 28-3 at 196-97) ("Q: Did you perceive that he was looking for other information? A: I thought he was looking for information between Kristy and me."). In other words, Plaintiff did not even suspect that Cooper knew of her emails to the legislators or that he wanted to search her phone in order to find those emails.

presumptions and assumptions."). More specifically, Plaintiff testified that, after she gave her cell phone to Alcorn and Amacker, she immediately went to her office to call her husband (from her work phone) and then returned to withdraw her consent for the search of her cell phone. When she returned, she believes she saw Mr. Amacker "shaking his head 'no' to Julie [Alcorn] . . . I was thinking he was saying, no, there's nothing on it," as in the phone had already been searched. (Pl. Dep., R. Doc. 28-3 at 199). But Plaintiff readily admits that she does not actually know whether her phone was searched, and she did not see her phone being searched. (Pl. Dep., R. Doc. 28-3 at 197-99). She ultimately explained: "But I don't know. That's why we need to talk to Joe [Amacker]." (Pl. Dep., R. Doc. 28-3 at 199); *see also* (Amacker Dep., R. Doc. 34-15 at 13) (never searched Plaintiff's cell phone on February 28, 2019, or at any other time).

And Plaintiff is not simply speculating that Amacker was able to search all of the emails on her work and personal accounts within minutes, but that Amacker somehow located her February 27, 2019 personal emails to the legislators and then communicated that information to Cooper. All of this had to occur before Plaintiff returned.

Not only does this speculation seem implausible, this "type of speculation is insufficient to create a genuine issue of material fact." *Harkness v. Bauhaus U.S.A., Inc*., 86 F. Supp. 3d 544, 563 (N.D. Miss. 2015) ("Plaintiff offers her own deposition testimony as proof that Jaggers preferred younger employees and that Hupper was Jaggers' favorite employee. This type of speculation is insufficient to create a genuine issue of material fact as to the existence of discriminatory animus."); *Lee v. Kansas City S. Ry. Co*., 574 F.3d 253, 258 (5th Cir. 2009) ("Lee offers only speculative inferences to support his assertion, which is insufficient to demonstrate the existence of a genuine issue of material fact.").

And so, the record evidence does not establish that Cooper (or anyone else) had actual knowledge of Plaintiff's protected speech before her constructive discharge. Therefore, she cannot establish an essential element of her retaliation claim—causation. *See Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003) ("in order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity"); *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.").

As a final matter, Plaintiff alternatively argues that she can survive summary judgment because Cooper had "constructive knowledge" of her general opposition to Cooper's becoming the permanent Superintendent. (R. Doc. 36 at 13) ("If Bello shows that Dr. Cooper should have known of her protected activity if he used reasonable care or diligence to learn of the activity in the performance of his job duties" — i.e., he had constructive knowledge— "then Bello has satisfied his [sic] burden on this element."). According to Plaintiff:

> [A] reasonable jury could infer that Dr. Cooper knew, or with reasonable diligence should have known, of Bello's opposition to him being confirmed by the Senate given his close and continuous contacts with Ms. Alcorn regarding all aspects of Bello's employment and that fact that Ms. Alcorn knew of Bello's opposition to Dr. Cooper's senate confirmation.

(R. Doc. 36 at 14). Plaintiff's argument misses the mark.

First, constructive knowledge is not the appropriate standard for Plaintiff's retaliation claim. In *Robinson v. Jackson State University*, the plaintiff alleged "two types of retaliation claims, Title VII and the First Amendment," both involving the same conduct. *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 358 (5th Cir. 2017). But while the Court noted that each claim

involved "its own elements," both claims had a "shared component—that there must be a causal connection between [the protected activity or speech] and [the adverse employment action]." *Id.* at 359. The Fifth Circuit therefore conducted a single analysis to determine whether Plaintiff had established causation. At the outset, the Fifth Circuit noted that the "causation prong of any retaliation claim requires proof that the employer knew about the employee's protected activity." *Id.* at 360. It went on to "clarify[y]" its standard for demonstrating decisionmaker knowledge in retaliation claims under either Title VII or the First Amendment:

> [I]n this circuit, [] we have consistently required proof of 'actual' decisionmaker knowledge. Whatever the law may be elsewhere, mere 'constructive notice' does not suffice in this circuit.

*Id.* (citing *Beattie v. Madison County School Dist.*, 254 F.3d 595, 604 (5th Cir. 2001) (retaliation under the First Amendment) and *Corley v. Jackson Police Dep't*, 639 F.2d 1296, 1300 n.6 (5th Cir. 1981) (retaliation under Title VII)).

Here, Plaintiff relies on *Taylor v. Union Pac. R.R. Co., Inc*., 2021 WL 952410, at *6 (M.D. La. Mar. 12, 2021) in arguing that "constructive knowledge" is all that is required. (R. Doc. 36 at 13 & n.66). However, *Taylor* considered a claim of discrimination under the Federal Railroad Safety Act, whose burden-shifting framework is unique to the FRSA and is "much easier" for a plaintiff to satisfy. *See Araujo v. New Jersey Transit Rail Operations, Inc*., 708 F.3d 152, 159 (3d Cir. 2013) ("It is worth emphasizing that the AIR–21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy . . . ."); *Davis v. Union Pac. R. Co*., 2015 WL 5519115, at *3 (W.D. La. Sept. 17, 2015) ("Considering the plain meaning of the statute, FRSA burden-shifting is much more protective of plaintiff-employees than the" framework applicable to claims under Title VII). Therefore, *Taylor* and its reliance on "constructive knowledge" are inapposite.

Second, even if constructive knowledge were sufficient, the record does not support Plaintiff's argument that Ms. Alcorn knew of Plaintiff's "opposition to Dr. Cooper's *senate confirmation.*" (R. Doc. 36 at 14) (emphasis added). To the extent this implies that Ms. Alcorn knew of Plaintiff's emails to the legislators on February 27, 2019, or that Ms. Alcorn had knowledge that Plaintiff specifically opposed Cooper's confirmation to the senate, there is no evidence supporting this contention. Instead, Ms. Alcorn testified that she "overheard" office "chatter" between Plaintiff and Kristy Flynn about Mr. Cooper on a single occasion in January or February of 2019:

> Q. Okay. What was the substance of the conversation? What did Ms. Bello say? What did Ms. Flynn say?
>
> A. That they didn't feel that he was the right fit.
>
> Q. Did they say why he wasn't the –
>
> A. I didn't hear any more after that.

(Alcorn Dep., R. Doc. 34-4 at 8). Once again, this in no way indicates that Ms. Alcorn knew that Plaintiff had expressed her opposition to Cooper's bid to be confirmed as SSD Superintendent to anyone, let alone anyone within the legislature. In other words, this does not show that Ms. Alcorn knew of Plaintiff's protected speech.

Instead, this testimony merely shows that Ms. Alcorn overheard two coworkers gossiping about their dislike for their supervisor. This type of workplace gossip is not protected speech. *See Connick v. Meyers*, 461 U.S. 138, 149-50 (1983) ("To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case."); *Bates v. Univ. of Tex. Med. Branch*, 425 F. Supp. 2d 826, 847 (S.D. Tex. 2003) ("even

where the content of speech relates to a topic of public concern, the speech itself is not a matter of public concern if it is made in furtherance of a personal employer-employee dispute"); *Terrell v. Univ. of Texas Sys. Police*, 792 F.2d 1360, 1362–63 (5th Cir. 1986) ("[I]t is plain that Gary Terrell's personal notebook cannot serve as the basis for a claim that he was fired for exercising his first amendment rights. He made no effort to communicate the contents of the notebook to the public . . . "); *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 187–88 (5th Cir. 2005) ("Typically, an employee speaks in furtherance of his personal employer-employee dispute when he discusses personnel matters directly impacting his job or criticizes other employees or supervisors' job performance.").

And even assuming Ms. Alcorn communicated this gossip to Cooper, and that his knowledge of this gossip played a part in Plaintiff's constructive discharge,[11] this doesn't amount to retaliation that violates the First Amendment. *See Reyes v. Salazar*, 2020 WL 4018597, at *9 (W.D. Tex. July 15, 2020) ("This circumstantial evidence could be interpreted as a showing that Salazar terminated Reyes because Salazar perceived Reyes as 'disloyal'. However, the issue of 'loyalty' is not material or pertinent to the analysis at this step because termination of a public employee on the grounds of disloyalty or incompatibility does not violate the employee's First Amendment right."); *De Los Santos v. City of New York*, 482 F. Supp. 2d 346, 354 (S.D.N.Y. 2007) ("The first time [plaintiff] disclosed what she saw—[in] a secretive conversation with Sgt. Maguire about co-workers' conduct—exhibits all the trappings of office gossip, not of constitutionally protected speech. The motive to dispense gossip, even gossip of interest to the public, does not denote public concern."). And so, Plaintiff cannot show that Cooper had any

---

[11] Plaintiff's efforts to highlight Ms. Alcorn's testimony that she overheard Plaintiff and Kristy Flynn talking of their dislike for Cooper as significant is further undercut by the fact that Cooper never terminated or even tried to terminate Flynn. (Cooper Dep., R. Doc. 28-1 at 267-68).

knowledge of any speech protected by the First Amendment before Plaintiff's constructive discharge on February 28, 2019. Her failure to satisfy this essential element of her claim entitles Defendants to summary judgment.

But even if the Court were to assume that Plaintiff had demonstrated causation, or at least a genuine issue of material fact as to causation, the inquiry would not end there. Indeed, the burden would then shift to Defendant to show it would have taken the same action absent the protected speech. For the reasons discussed below, Defendant easily meets this burden, and Plaintiff cannot rebut it.

### ii.    The *Mount Healthy* Defense and Pretext

If a plaintiff establishes a prima facie case of retaliation, the burden then shifts "to the defendant to show that [it] would have taken the challenged action even without the impermissible motive"—this is sometimes referred to as the '*Mount Healthy* defense.' *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (recognizing that a defendant prevails if it "show[s] by a preponderance of the evidence that it would have reached the same decision as to respondent's employment even in the absence of the protected conduct"). If the defendant meets this burden, it is then up to the plaintiff to come forward with evidence that the employer's reasons are pretextual. *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991) ("The employee can refute that showing by evidence that his employer's ostensible explanation for the discharge is merely pretextual.").

Here, Defendants argue in their Motion for Summary Judgment that Plaintiff's First Amendment retaliation claim must fail because she would have been terminated (or asked to resign) regardless of any protected speech. This argument finds ample support in the record.

Moreover, as explained below, Plaintiff cannot show that any of Defendants' proffered reasons are pretext for retaliation.

First, during the meeting on February 28, 2019, Plaintiff lied to her supervisor, Cooper, when confronted about the text message she sent to Flynn. She was constructively discharged following this dishonesty about her communication with Kristy Flynn. Moreover, Cooper considered that communication as Plaintiff's interfering in the confidential investigation concerning misconduct at LSEC, where Flynn served as the Director. (Alcorn Dep., R. Doc. 34-4 at 12). And to be sure, Plaintiff has not offered any evidence that Cooper's reasons for terminating her were pretextual. Indeed, this material fact — that Plaintiff lied to Cooper when confronted on February 28, 2019, about messaging Kristy Flynn — is not in dispute. Plaintiff readily admits in her deposition that she initially lied to Cooper when he asked about the text message. (Pl.'s Dep., R. Doc. 28-3 at 197) (Cooper told Plaintiff he thought she was being untruthful about texting Flynn); (Pl.'s Dep., R. Doc. 28-3 at 202) (Cooper believed Plaintiff was lying and he was inclined to fire her); (Pl.'s Dep., R. Doc. 28-3 at 202) (Plaintiff admits that she did lie to Cooper). And so, the record contains uncontradicted evidence that Defendant would have constructively discharged Plaintiff on February 28, 2019, regardless of any protected speech. For this reason, she cannot survive summary judgment.

Beyond that, the record makes clear that Cooper had real doubts about Plaintiff's abilities within the first couple of months after becoming Interim Superintendent in July of 2018. Indeed, he seriously contemplated terminating Plaintiff's employment in early September of 2018— months before she engaged in any protected speech. On September 5, 2018, Cooper emailed his direct supervisor, John White:

> Just an FYI. Had to do a formal reprimand of Leslie Bello yesterday. I am trying to salvage her, but may not be possible. I briefed Jamie.

Leslie is the only resistant administrator at SSD I have encountered so far. Very passive aggressive, resistant to supervision, and apparently disingenuous as she tries to bulldoze and blame in order to get her way and justify her failures.

I will meet with her today to discuss. I don't intend to begin termination at this point as I feel she has not been supervised in a long while and perhaps will come around. I have a plan to give her close supervision by Sandra Billeaudeau to assist in her being a better principal, however, she will have to change her attitude.

(R. Doc. 28-1 at 273).

Just the day before this email was sent, Plaintiff received a formal reprimand from her direct supervisor, Marie Henderson, after Plaintiff became confrontational in a meeting with Henderson on August 30, 2018. (R. Doc. 34-6). In the Letter of Reprimand, Henderson refers to Plaintiff's "threatening outburst" and "lack of professionalism." (R. Doc. 34-6 at 2). The Letter of Reprimand also outlined deficiencies that Henderson perceived in Plaintiff's job performance and concluded by advising Plaintiff that Henderson would be sending the Letter to Cooper with a "recommendation for further disciplinary actions, including up to termination". (R. Doc. 34-6 at 2-3) (deficiencies included "providing inadequate documentation of student aggressive behaviors," "inadequate supervision of the LIMC," "providing conflicting information to the turnaround team," and a "lack of inclusive practices for students assessed on an alternative assessment").

Plaintiff submitted a response to the Letter of Reprimand (R. Doc. 34-7), but after reviewing both the Letter of Reprimand (R. Doc. 34-6) and Plaintiff's Response (R. Doc. 34-7), Dr. Cooper sent Plaintiff a letter on September 6, 2018, outlining why he was "supporting Dr. Henderson in her reprimand" of Plaintiff. (R. Doc. 34-32). In that letter, Cooper details additional "instances of disturbing behavior" by Plaintiff:

- Making an employee return to Dr. Cooper's office to inquire about an issue, although the employee had already been told by Cooper's assistant that he was not

available. According to Cooper, this made the employee "very uncomfortable" and it "also did not sit well with [Cooper's] assistant."

- Another employee reported that when she asked Plaintiff to be paid for driving the bus, Plaintiff informed the employee that Plaintiff had already asked Cooper, who had declined the request for pay. This was not true. In fact, [Plaintiff] never talked to [Cooper] about this." The employee intended to file a grievance. *See also* (R. Doc. 34-26) (Dr. Cooper received an email from the reporting employee on August 30, 2008, which details Plaintiff's representations to the employee about compensation for driving the bus. All of Plaintiff's representations, Dr. Cooper responded to the employee, were untrue.).

- Cooper indicated being "privy to reports that the staff is very wary of [Plaintiff's] temper and the retribution [Plaintiff] [is] capable of delivering . . . There appears to be a negative fear factor present among staff." *See also* (R. Doc. 34-27 at 4) (On September 7, 2018, George Thompson, submitted a written complaint to HR Director, Julie Alcorn, claiming Plaintiff "berated [him]" at school and expressed "doubts as to [his] professional competency" for not following a new policy — a policy which Thompson claims he "had no knowledge of" and was not officially communicated to staff until 3 days after this incident. According to Thompson, "these behaviors cause a deterioration of morale [and] do not contribute to a positive school and work environment . . . .").

(R. Doc. 34-32). Cooper's letter made clear that he considered these instances as examples of Plaintiff's "disruption of the workplace . . . insubordination and dereliction of duty." (R. Doc. 34-32). And "[b]ecause of these verifiable indications," Cooper explained to Plaintiff that she "appear[ed] to lack the necessary leadership skills, the willingness to work as a team member," and "possess[ed] . . . both a skeptical and passive aggressive attitude relative to the direction of SSD." (R. Doc. 34-32). For these reasons, Cooper advised Plaintiff that he was directing HR to place her on "exigency leave until further notice and/or further disciplinary actions are taken." (R. Doc. 34-32).

Three days later on September 9, 2018, Cooper again emailed his supervisor, John White, about Plaintiff:

I am contemplating terminating Leslie Bello, Interim Director of LSVI, tomorrow at the end of the day. I think we could teach and remediate the academic pieces, but not without some very basic changes in her leadership abilities and flaws.

> There appears to be a culture of fear and retribution at that school under her
> leadership. I have no trust in her and her willingness to be part of a team. My
> opinion is that she is and will continue to poison the well.

(R. Doc. 28-1 at 279).

The following day, Cooper decided not to terminate Plaintiff but instead suspended her for

5 days without pay from September 10, 2018, until September 14, 2018, because:

- You have been insubordinate and threatened your direct supervisor . . .
- You did not properly document student aggressive behaviors in JCampus.
- Numerous complaints that you verbally harass LSDVI staff and intimidate
  students.

(R. Doc. 34-9). While on leave, Cooper received additional complaints about Plaintiff. (R. Doc.

34-33) (Cooper's September 14, 2018 draft of an Employee Intensive Improvement Plan for

Plaintiff describes numerous complaints from staff at LSVI about Plaintiff's temper, demeaning

attitude, and lack of substantive knowledge). As an example, on September 14, 2018, Cooper

received an email from Renee Griffith with the West Baton Rouge Parish School District. In that

email, Griffith asked to meet with Cooper that day to discuss "concerns . . . in person" about how

Plaintiff and another employee handled allegations of "inappropriate behavior by a student toward

another student." (R. Doc. 34-33). Griffith was not comfortable discussing the situation in writing.

Upon returning to work on September 17, 2018, Plaintiff received an employee

improvement plan from Cooper, which recommended 7 improvements Plaintiff should make to

succeed at LSVI. (R. Doc. 34-22). These recommendations included being professional,

collaborative, ethical, accurate in providing information to others, polite (e.g., "refrain from raising

your voice and yelling in a berating manner"), and "willing[] to accept and use suggestions for

improvement." (R. Doc. 34-22).

The recommendations also referenced working with Plaintiff's supervisor to determine the "duties that are assigned to the Director and carry[ing] those duties out in a timely and professional manner." (R. Doc. 34-22). Similarly, Plaintiff was advised to "display appropriate leadership skills and professional behavior," allowing the "principal of LSVI to direct the school without undue interference." (R. Doc. 34-22). These two recommendations were related to Plaintiff's change in job title, which also occurred on September 17, 2018. (R. Doc. 34-12). Specifically, Plaintiff's title was changed from Interim Director of LSVI to Director of LSVI on September 17, 2018. (R. Doc. 34-11 at 2) (September 15, 2018 email from Cooper to others in management: "I will meet with Leslie [Bello] Monday . . . to discuss my expectations for her behavior and adjusted job description.").

Plaintiff makes much of this, claiming that being made the permanent Director of LSVI was a "promo[tion]" and therefore contradicts Cooper's allegations that her job performance was deficient and calling into question his September 10, 2018 suspension of Plaintiff and her subsequent discharge. (R. Doc. 36 at 18). Plaintiff therefore points to her change in job status on September 17, 2018, as evidence of pretext in order to survive summary judgment. (R. Doc. 36 at 18). But characterizing this change in position as a 'promotion' is wholly inconsistent with the record evidence.

While Plaintiff was made the permanent Director of LSVI, it came "with a change in job description." (Cooper Dep., R. Doc. 28-1 at 238). Indeed, the record contains draft versions of the Director of LSVI job description and discussions between various individuals about the changes being made to the job prior to Plaintiff's being named as the Director. (R. Doc. 34-11 at 8-10) (draft version of revised job description, including strike-through of former duties); (R. Doc. 34-11 at 1) (email from Sandra Billeaudeau about revisions: "I hope I understand correctly, you do

not want [Bello] involved with academics."). Following these revisions, as of September 17, 2018, the job of Director of LSVI now involved outreach — Plaintiff was no longer allowed to do anything related to academics, as she had been while serving as the Interim Director with the job duties contained in the original job description. (Cooper Dep., R. Doc. 28-1 at 237); (R. Doc. 34-11 at 1) (September 15, 2018 email from Sandra Billeaudeau about revisions to job description: "I hope I understand correctly, you do not want her involved with academics."); (Alcorn Dep., R. Doc. 34-4 at 13) ("[Cooper] took her out of her current - - the director of LSVI . . . because she was impeding the growth of the educational department. . . . She was moved from interim director to director, no raise or money.").

Beyond that, the record contains evidence that Plaintiff fully understood that her job duties had substantially changed when she went from being the Interim Director to the permanent Director on September 17, 2018. She even emailed Meredith Jones and Marcia Speed on September 21, 2018, because she was confused about her new position: "I am very confused. I don't know where I fit or exactly what I do. Which bucket? Do I supervise outreach – both?" (R. Doc. 34-13). In her own words, Plaintiff recalls being told that, in her new job as the permanent Director, she "no longer had any dealings with the school" and she would instead "work on finding jobs for LSVI students upon graduation, but I was not to involve myself with the school. . . . I have been sitting in my office doing nothing since September." (R. Doc. 36-2 at 34).

The record is clear — Plaintiff did not view this as a simple change from interim to permanent Director. Instead, she understood that many of her responsibilities had been taken away and that she was performing a different job as of September 17, 2018. Her efforts to characterize this as a 'promotion' in order to show pretext is not supported by any record evidence.

Plaintiff additionally points to Cooper's deposition testimony in which he admitted that he sometimes relied on his staffs' reporting of information, as opposed to directly reviewing that information himself, when it came to Plaintiff's alleged deficiencies at work and his reasons for not trusting her. (R. Doc. 36 at 20-21). Plaintiff also makes much of Cooper's being unable to specifically recall individuals who were intimidated by Plaintiff during his deposition. (R. Doc. 36 at 20-23). However, none of this is sufficient to create a genuine issue of material fact as to pretext "because the issue . . . is not whether Plaintiff was, in fact, a good employee but rather whether Defendant actually and reasonably believe that specific errors and attitude problems warranted" the adverse employment action. *Harkness v. Bauhaus U.S.A., Inc*., 86 F. Supp. 3d 544, 560–61 (N.D. Miss. 2015).

Here, the record is replete with evidence that Cooper genuinely did not trust Plaintiff and believed she was a detriment to LSVI and that he had been contemplating her termination for months—long before she engaged in any protected activity. (Cooper Dep., R. Doc. 28-1 at 89-91, 218-19, 246-47). There is also no dispute that Plaintiff indeed lied to Cooper during their meeting on the morning of February 28, 2019, and that Cooper forced her resignation because he believed Plaintiff was being untruthful about her communications with Flynn and had interfered in LSEC's investigation. Plaintiff might think that Cooper was wrong to think she was not a stellar employee, or even that Cooper did not do his due diligence in personally looking into complaints against her and instead relying on reports from others. But that is not the point. Cooper's reasons for constructively discharging Plaintiff can be wrong—they just can't be pretextual. *See Reyes v. Salazar*, 2020 WL 4018597, at *9 (W.D. Tex. July 15, 2020) ("Although Salazar's reliance on these factors may not be justified or based in truth, these personal reasons are still sufficient . . . ."); Correa v. Fischer, 982 F.2d 931, 935 (5th Cir. 1993) ("A termination arising from a personal

feud or from no cause at all may be baleful, but it is not a patronage dismissal in violation of the First Amendment.").

For the reasons given above, Plaintiff cannot establish an essential element of her prima facie case — causation — or that Cooper's reasons for forcing her resignation were pretextual. Instead, Cooper has produced sufficient evidence that he would have terminated Plaintiff despite any protected speech. The Court therefore recommends that Defendants are entitled to summary judgment on Plaintiff's First Amendment Retaliation Claim. And for the same reasons, Defendants are also entitled to summary judgment on Plaintiff's retaliation claim under article I, section 7 of the Louisiana Constitution. *See Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 231 (5th Cir. 2016) ("As summary judgment is proper as to Plaintiffs' First Amendment claims, summary judgment is also proper on Plaintiffs' Article I, § 7 state law claims.").[12]

## B.    Fourth Amendment Retaliation

Plaintiff additionally claims that her constructive discharge on February 28, 2019, was done in retaliation for Plaintiff's exercising her Fourth Amendment right to be free from unreasonable searches and seizures by refusing to let Cooper search her personal cell phone for communications between Plaintiff and Kristy Flynn. For purposes of this Motion for Summary Judgment, the Court assumes that a claim for retaliation exists under the Fourth Amendment, as Plaintiff suggests. (R. Doc. 36 at 23). The elements of Plaintiff's Fourth Amendment retaliation claim are the same as her claim for retaliation under the First Amendment. *See McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998) ("To prevail on a claim of retaliation, a [plaintiff] must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation."); *see also*

---

[12] Because Plaintiff cannot establish a violation of her rights protected by the First Amendment, the Court does not consider whether Defendant is entitled to qualified immunity.

*Lozano v. Ortega*, 2014 WL 6611595, at *11 (W.D. Tex. Nov. 19, 2014) ("While § 1983 retaliation claims are exceedingly rare outside of the First Amendment context, a plaintiff may maintain a retaliation claim predicated upon a different constitutional right provided" he or she meets the same elements for retaliation under the First Amendment.).

For purposes of this Motion for Summary Judgment, the Court will also assume that Plaintiff has made out a prima facie case of retaliation in violation of the Fourth Amendment. However, for the reasons already explained in detail above, the record is replete with evidence that Cooper would have forced Plaintiff's resignation, even absent her refusal to allow the search of her personal cell phone. Moreover, for the same reasons already given above, Plaintiff cannot show that Cooper's proffered reasons for her constructive discharge are pretextual. And so, the Court recommends that Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment retaliation claim, as well as her claim for retaliation in violation of article I, section 5 of the Louisiana Constitution.[13]

### C.    Official Capacity Claim Against Ernest E. Garrett

Plaintiff has additionally sued Ernest Garrett, the current Superintendent of the Special School District, for injunctive relief. Specifically, Plaintiff sues Garret for reinstatement to her position as "Director of LSVI from which she was constructively discharged." (R. Doc. 1 at 8). However, Plaintiff's claim against Garrett is contingent on Plaintiff successfully litigating her retaliation claims against Cooper. Because the Court recommends that Plaintiff's retaliation claims against Cooper be dismissed with prejudice, as Plaintiff cannot establish retaliation in violation of any constitutionally protected rights, her contingent claim for injunctive relief against Garrett should likewise be dismissed with prejudice.

---

[13] Because Plaintiff cannot establish a violation of her rights protected by the Fourth Amendment, the Court does not consider whether Defendant is entitled to qualified immunity.

### D. State Law Defamation Claim

Plaintiff has also sued Cooper for defamation under state law. Because the Court recommends that all Plaintiff's federal claims be dismissed with prejudice, it should decline to exercise supplemental jurisdiction over Plaintiff's state law defamation claim against Cooper. (R. Doc. 1). And so, if the Court adopts this Report and Recommendation, it should also "decline to exercise jurisdiction" over Plaintiff's state law defamation claim against Cooper, 28 U.S.C. § 1367(c)(3), dismissing that state law claim without prejudice. *See Enochs v. Lampasas Cnty.*, 641 F.3d 155, 161 (5th Cir. 2011) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed.").

## IV. CONCLUSION

The Court has considered Defendants' Motion for Summary Judgment (R. Doc. 28), including the parties' associated briefing (R. Docs. 28, 31, 34, 36, 40, 45), as well as the evidence the parties filed in the record (R. Docs. 28-1 to 28-6, 34-3 to 34-37, 36-2), and their Statements of Material Facts (R. Docs. 28-8, 34-2, 36-1, 38). For the reasons given above,

**IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment (R. Doc. 28) be **GRANTED**. Plaintiff's federal and state constitutional claims for retaliation should be **DISMISSED with prejudice**. Plaintiff's claim for injunctive relief against Garrett should likewise be **DISMISSED with prejudice**. And the Court should "decline to exercise jurisdiction" over Plaintiff's state law defamation claim against Cooper pursuant to 28 U.S.C. § 1367(c)(3), which should be **DISMISSED without prejudice**, *see Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th

Cir. 1999) ("When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims. However, the dismissal of the pendent claims should expressly be without prejudice . . . .").

Signed in Baton Rouge, Louisiana, on September 13, 2022.


_____
**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**